UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

REBECCA MCCOOK,

        Plaintiff,

v.                              CASE NO. 3:17-cv-823-J-32MCR

AETNA LIFE INSURANCE COMPANY,

        Defendant.

_____/

**REPORT AND RECOMMENDATION**[1]

    **THIS CAUSE** is before the Court on Defendant's Dispositive Motion for Summary Judgment with Statement of Undisputed Material Facts ("Defendant's Motion") (Doc. 15), Plaintiff's Response thereto (Doc. 25), Defendant's Court-Authorized Reply to Plaintiff's Response ("Reply") (Doc. 29), Plaintiff's Motion for Summary Judgment ("Plaintiff's Motion") (Doc. 17), and Defendant's Memorandum of Law in Opposition thereto (Doc. 24).[2]  For the reasons stated

---

    [1] "Within 14 days after being served with a copy of [a report and recommendation on a dispositive motion,] a party may serve and file specific written objections to the proposed findings and recommendations."  Fed.R.Civ.P. 72(b)(2).  "A party may respond to another party's objections within 14 days after being served with a copy."  *Id*.  A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was not made.  *See* Fed.R.Civ.P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; M.D. Fla. R. 6.02.

    [2] On September 25, 2017, before the instant Motions were filed, this case was referred to the undersigned for a report and recommendation regarding an appropriate resolution of the case.  (Doc. 10.)

herein, it is respectfully **RECOMMENDED** that Defendant's Motion be **GRANTED** and Plaintiff's Motion be **DENIED**.

## I.  Introduction

This action is brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*  (Doc. 1, ¶ 1.)  Plaintiff challenges Defendant's decision to terminate her long-term disability ("LTD") benefits under the LTD Plan, which is governed by ERISA, sponsored by Bank of America ("BOA"), and insured and administered by Aetna Life Insurance Company ("Aetna").  (*Id.* at ¶¶ 5-6; Doc. 8, ¶¶ 5-6 ("Aetna Life admits that, at certain times relevant herein, it was the claims administrator and insurer of benefits under the Policy[,] which was granted full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy by the Plan Sponsor/Plan Administrator, BOA; admits that it made the final decisions regarding claims made under the Policy; and admits that it bore the ultimate responsibility for paying eligible claims under the Policy."); AR[3] 2426, 2486.)

Plaintiff was a participant in the Plan through her employment as a Foreclosure Specialist II with BOA.  (AR 58, 844, 1921.)  She ceased working as of July 8, 2015 due to generalized anxiety disorder ("GAD"), obstructive sleep apnea ("OSA"), and hypersomnia, for which she received short-term disability

---

[3] All citations to the administrative record filed with the Court (*see* Docs. 16, 18), are in the format "AR [page number]" in this Report and Recommendation.

("STD") benefits through January 5, 2016.  (AR 211, 231, 1025-26.)  Plaintiff appealed the termination of her benefits, claiming disability due to anxiety, depression, OSA, idiopathic hypersomnia, fibromyalgia, and migraine headaches. (AR 1042-43, 1049, 1977.)  On August 2, 2016, Aetna found that Plaintiff was disabled from her own occupation from a behavioral perspective and was eligible for LTD benefits effective January 6, 2016 and continuing for up to 18 months. (AR 740-42.)

On December 1, 2016, Aetna terminated Plaintiff's LTD benefits effective December 1, 2016, because there was "insufficient evidence of [a] functional impairment in [Plaintiff's] physical or mental capacity that would preclude [her] from performing [her] own sedentary occupation as defined by [the LTD Plan]." (AR 776-80.)  On July 10, 2017, Aetna upheld its decision to terminate Plaintiff's benefits.  (AR 806-08.)

On July 19, 2017, Plaintiff filed this lawsuit, claiming that her LTD benefits should not have been terminated because she remains disabled as defined by the Plan.  (*See generally* Doc. 1.)  Plaintiff claims that she "is entitled to benefits for disability from her own occupation from December 1, 2016 to July 8, 2017, reasonable attorneys' fees and costs, and remand to the administrator for consideration of benefits for disability from any occupation from July 9, 2017 onward."  (Doc. 17 at 21.)

## II.    Summary of Facts

### A.    The LTD Plan

The LTD Plan sets forth the test of disability as follows:

> From the date that you first became disabled and until monthly
> benefits are payable for 18 months you meet the test of disability on
> any day that:
> •       You cannot perform the **material duties** of your **own occupation**
>         solely because of an **illness, injury** or disabling pregnancy-related
>         condition; and
> •       Your earnings are 80% or less of your **adjusted predisability**
>         **earnings**.
> **After the first 18 months of your disability** that monthly benefits
> are payable, you meet the plan's test of disability on any day you are
> unable to work at any **reasonable occupation** solely because of an
> **illness, injury** or disabling pregnancy-related condition.

(AR 2406 (emphasis in original); *see also* Doc. 1-1 at 16.)

"Material duties" are defined as duties that "[a]re normally needed for the

performance of your own occupation; and [c]annot be reasonably left out or

changed."  (AR 2421 (emphasis omitted).)  "However, to be at work more than 40

hours per week is not a material duty."  (*Id.*)

"Own occupation" is defined as "[t]he occupation that you are routinely

performing when your period of disability begins."  (AR 2421; Doc. 1-1 at 28.)

> Your occupation will be viewed as it is normally performed in the
> national economy instead of how it is performed:
> •       For your specific employer; or
> •       At your location or work site; and
> •       Without regard to your specific reporting relationship.

(*Id.*)

An illness is defined as "a pathological condition of the body that presents a group of clinical signs and symptoms[,] and laboratory findings[,] peculiar to the findings[,] set the condition apart as an abnormal entity differing from other normal or pathological body states."  (AR 2420.)

"Reasonable occupation" is defined as "any gainful activity[] [f]or which you are, or may reasonably become, fitted by education, training, or experience; and [w]hich results in, or can be expected to result in, an income of more than 60% of your adjusted predisability earnings."  (AR 2423 (emphasis omitted); Doc. 1-1 at 30.)

The LTD benefit eligibility ends when, *inter alia*, the first of the following occurs:

- The date you no longer meet the LTD test of disability, as determined by Aetna.
. . .
- The date an independent medical exam report or functional capacity evaluation does not, in Aetna's opinion, confirm that you are disabled.
- The date you reach the end of your Maximum Benefit Duration, as shown in the Schedule of Benefits.

(AR 2407 (emphasis omitted); Doc. 1-1 at 17; *see also* AR 2405 (providing that LTD benefits "will be payable for as long as your period of disability benefit eligibility continues but not beyond the end of the Maximum Monthly Benefit Period").)  Further, under the Plan, a claimant "will no longer be considered as disabled and eligible for long term monthly benefits after benefits have been

payable for 24 months if it is determined that [the claimant's] disability is primarily caused by[] [a] mental health or psychiatric condition, including physical manifestations of these conditions."  (AR 2408; Doc. 1-1 at 17.)

Eligibility for other income benefits, such as benefits under the Social Security Act, is taken into consideration when calculating the monthly LTD benefit.  (AR 2409; Doc. 1-1 at 18-19.)  The Plan provides: "It is your responsibility to enroll or apply for benefits from other sources if you are eligible." (AR 2409.)  "Any monthly benefit actually payable to you by Aetna will be reduced by other [i]ncome benefits."  (AR 2430 (emphasis omitted).)

With respect to claim determinations, the group Policy provides, in relevant part, that Aetna is "a fiduciary with complete authority to review all denied claims for benefits under this Policy," and that Aetna "shall have discretionary authority to determine whether and to what extent eligible employees and beneficiaries are entitled to benefits and to construe any disputed or doubtful terms under this Policy, the Certificate or any other document incorporated herein."  (AR 2507.)  It goes on to state that Aetna "shall be deemed to have properly exercised such authority unless [it] abuse[s] [its] discretion by acting arbitrarily and capriciously." (*Id.*)

B.     **Plaintiff's LTD Benefits**

Plaintiff worked as a Foreclosure Specialist II with BOA when her disability

began.  (AR 724.)  She describes her "[o]riginal [m]inimum [c]ore [j]ob

[r]esponsibilities" as follows:

> 1) Review and approve prepared bidding instructions for upcoming
> foreclosure sales.  Provide feedback directly to associates and their
> manager for further review if corrections are needed due to investor,
> insurer, or state mandated guidelines, and follow up to ensure
> corrections are completed before approving the bidding instructions.
>
> 2) Complete quality audits on file transfer reviews completed for
> post-foreclosure sale forms and update systems with a completed
> manager file transfer template note.  Provide feedback directly to
> associates and their manager regarding any errors found, and follow
> up to ensure corrections are completed by the associate before
> finishing the manager file transfer template, and ensure errors are
> logged in sharepoint.

(AR 1044; *see also* AR 1044-45 (listing actual day-to-day job responsibilities).)

Pursuant to the Department of Labor's Dictionary of Occupational Titles

("DOT"), the code for a mortgage clerk (financial) is 249.362-014, the strength

level is sedentary, and the Specific Vocational Preparation ("SVP") level is 5.[4]

The duties of a mortgage clerk (financial) are described in the DOT as follows:

> Performs any combination of [the] following duties to process
> payments and maintain records of mortgage loans: Types letters,
> forms, checks, and other documents used for collecting, disbursing,

---

[4] The SVP level "is defined as the amount of lapsed time required by a typical
worker to learn the techniques, acquire the information, and develop the facility needed
for average performance in a specific job-worker situation."  (AR 58-59.)  For a job with
an SVP level of 5, the time period is over six months, up to and including a year.  (AR
59.)

and recording mortgage principal, interest, and escrow account payments, using [a] computer.  Answers customer questions regarding [a] mortgage account and corrects records, using [a] computer.  Examines documents such as deeds, assignments, and mortgages, to ensure compliance with escrow instructions, institution policy, and legal requirements.  Records disbursement of funds to pay insurance and tax.  Types notices to [the] government, specifying changes to loan documents, such as [a] discharge of mortgage.  Orders property insurance policies to ensure protection against loss on mortgaged property.  Enters data in [the] computer to generate tax and insurance premium payment notices to customers.  Reviews printouts of allocations for interest, principal, insurance, or tax payments to locate errors.  Corrects errors, using [a] computer.  May call or write loan applicants to obtain information for bank official[s].  May be designated according to [the] type of work assigned[,] as [an] Escrow Clerk (financial); [a] Foreclosure Clerk (financial); [an] Insurance Clerk (financial); [and a] Tax Clerk (financial).

BOA used the above cited DOT description for a mortgage clerk (financial), adding the following duties: "Works closely with foreclosure attorneys and trustees and services the foreclosure during the process.  Monitors many different queues and applications to ensure the process is moving, and executes daily reports with time sensitive material."  (AR 58.)

Plaintiff ceased working as of July 8, 2015 due to GAD, OSA, and hypersomnia.  (AR 211, 231, 1026.)  Aetna approved and paid STD benefits from July 8, 2015 through January 5, 2016.  (AR 1025.)  By a letter dated December 31, 2015, Aetna terminated Plaintiff's benefits, effective January 6, 2016.  (AR 724-25.)  The letter provided, in relevant part:

In summary, the clinical information received does not continue to substantiate that you are unable to perform the duties of your

8

occupation as it is defined in the national economy as a Foreclosure Specialist II effective 01/06/2016.  There has been no updated medical information provided for review[,] such as medical records, psychological test results, or physical or psychological therapy summaries which provide documentation as to why you are unable to perform the duties of your own occupation.  As a result, your [LTD] benefits are being denied effective 01/06/2016.

(AR 725.)  Aetna emphasized that Plaintiff's "own occupation as a Foreclosure Specialist II is not limited to a specific job with a specific employer."  (AR 724-25.)  After receiving additional documentation from Peter A. Nassar, M.D. and Lielanie Aguilar, M.D.,[5] on January 15, 2016, Aetna determined that Plaintiff's LTD "benefits are to remain denied effective 01/06/2016."  (AR 733.)

In June 2016, Plaintiff submitted additional documentation in support of her claim, including medical records from Dr. Nassar (AR 1164-76, 1219) and Dr. Aguilar (AR 1191-1203, 1218), and a letter dated January 27, 2016 from Audrey Dearborn, a Licensed Mental Health Counselor ("LMHC") (AR 1220).  On June 23, 2016, Plaintiff appealed the denial of her claim, enclosing a report from Joshua E. Shannon, Ph.D., dated June 15, 2016.  (AR 1152-56.)

On July 13, 2016, Plaintiff wrote to Aetna, advising that on April 12, 2016, the Social Security Administration ("SSA") had approved her claim for Social Security Disability Insurance ("SSDI") benefits, with an effective beginning date of January 2016.  (AR 1052, 1070.)  The records from the SSA file, which had already been provided to Aetna on May 26, 2016, were enclosed with the letter.

---

[5] Some of the records refer to Dr. Aguilar as Dr. Aguilar-Pascasio.

(AR 1055-1095.)  Ms. Dearborn's June 29, 2016 letter and Dr. Nassar's July 12, 2016 correspondence were also enclosed.  (AR 1053-54.)  The letter asked Aetna to "proceed with the appeals process."  (AR 1052.)

By a letter dated July 18, 2016, Plaintiff formally appealed the denial of her LTD benefits, asserting disability due to anxiety and depression, as well as sleep apnea, idiopathic hypersomnia, fibromyalgia, and migraines.  (AR 1042-43, 1049, 1977.)  Plaintiff attached, *inter alia*, a description of her actual day-to-day job responsibilities and original minimum core job responsibilities as a Foreclosure Specialist II with BOA.  (AR 1044-48.)

To assist Aetna's evaluation of Plaintiff's appeal, an independent peer review was conducted by consulting psychologist Jeremy Hertza, Psy.D.  (AR 1031-41.)  In a report dated July 15, 2016, Dr. Hertza advised that Plaintiff was functionally impaired from July 8, 2015 through the date of his report, due to the combined effects of depression, anxiety, hypersomnia, and/or OSA.  (AR 1031-41.)  A second peer review on appeal was performed on July 26, 2016 by Tajuddin Jiva, M.D., Board certified in internal medicine, pulmonary disease, and sleep medicine, who advised that Plaintiff did not have any functional impairments from July 8, 2015 through the date of the report, from a sleep medicine perspective.  (AR 1023-30.)

By a letter dated August 2, 2016, Aetna informed Plaintiff that the original decision to deny her LTD benefits was being overturned and she was found to be

totally disabled from her own occupation from a behavioral perspective.  (AR 740-42.)  Plaintiff was eligible to receive monthly benefits effective January 6, 2016 and continuing for up to 18 months.  (AR 742.)  Plaintiff was informed that Aetna would be offsetting her benefits by $1,387.00 per month for SSDI benefits.  (AR 743.)

In a letter dated December 1, 2016, Aetna terminated Plaintiff's LTD benefits effective December 1, 2016.  (AR 776-80.)  Citing, among other things, Dr. Aguilar and Ms. Dearborn's records,[6] Aetna determined that Plaintiff no longer met the test of disability, because there was "insufficient evidence of [a] functional impairment in [Plaintiff's] physical or mental capacity that would preclude [her] from performing [her] own sedentary occupation as defined by [the] [P]lan."  (AR 779.)  Aetna explained:

---

[6] Aetna acknowledged that Ms. Dearborn did not recommend that Plaintiff return to work due to anxiety.  (AR 778.)  Dr. Aguilar, on the other hand, indicated that Plaintiff's anxiety had been improving and it was hard to say whether Plaintiff would be able to perform her job functions until she returned to work.  (Id.)  Aetna explained:

> On 10/26/2016, we contacted [Ms. Dearborn] to clarify her report.  We explained to Ms. Dearborn that the information she submitted lacked sufficient examples of [] severity and intensity of [a] psychiatric impairment.  We advised that we received conflicting reports from her and Dr. Aguilar concerning your ability to complete household chores, self-care, and recreational activities.  Ms. Dearborn expressed that she understood and the discrepancy is likely because she needs to work more closely with your psychiatrist.  She noted that the information she provided is based on what you report and describe in sessions.  She reported that your conversation is primarily focused on aches, pains and lack of sleep.  Ms. Dearborn added that you report that your daily activities are impacted by panic attacks, low energy and muscle tension.

(Id.)

The current information does not substantiate an ongoing functional psychological impairment.  From a behavioral perspective, your recent mental status exams continue to be within normal limits.  Your doctor describes that presently you are less anxious[,] with brighter affect, clear speech[,] clear, goal directed thought process, grossly intact memory, and no reported panic attacks in several months.  You have also reported [] your functionality has increased now as you have been able to perform self-care more consistently, initiating and working on home projects, running errands out of the home, driving, helping to care for [your] spouse, and family planning.  There is no report of adverse medication effects and a referral to [a] higher level of care is not warranted.  There were no observations of any severity indicators[,] including abnormal cognition[], emotional lability, behavioral apathy, or risk issues.  Although your therapist recommends you remain out of work and your Psychiatrist is unsure if you will be able to perform your job duties, the information submitted does not provide severe symptoms or behaviors that demonstrate [a] functional impairment from your own occupation.

(AR 778.)  As there was "no evidence of [an] impairment that would prevent [Plaintiff] from performing the material duties of [her] own occupation as a Mortgage Clerk as it exists in the national economy," Plaintiff's LTD benefits were terminated effective December 1, 2016.  (AR 779.)

Of note, Aetna's letter of December 1, 2016 addressed the decision of the SSA awarding SSDI benefits to Plaintiff, as follows:

We understand that you have been approved for [SSDI] benefits.  However, our disability determination and the [SSDI] determination are made independently and are not always the same.  The difference between our determination and the [SSDI] determination may be driven by the [SSA] regulations.  For example, SSA regulations require that certain disease[s]/diagnoses or certain education or age levels be given heavier or even controlling weight in determining whether an individual is entitled to [SSDI] benefits.  Or, it may be driven by the fact that we have information that is different from what [the] SSA considered.  Your Social Security award was

dated 04/12/2016[,] which is more than 6 months ago and no longer current.  Therefore, even though you are receiving [SSDI] benefits, we are unable to give it significant weight in our determination, and we find that you are no longer eligible for LTD benefits based on the [P]lan definition of Totally Disabled quoted above.

(*Id.*)

By correspondence dated May 24, 2017, Plaintiff's counsel appealed the termination of benefits.  (AR 781, 853.)  On appeal, counsel submitted documentation in regards to Plaintiff's physical conditions, including fibromyalgia, OSA, idiopathic hypersomnia, and migraine headaches.  (AR 800, 817.)  In support, counsel submitted Dr. Nassar's April 5, 2017 letter (AR 886), Sofija Rak, M.D.'s April 24, 2017 treatment note (AR 854-58), and David A. Libert, M.D.'s May 23, 2017 report (AR 820-22, 870-73).[7]

At Aetna's request, consulting psychologist, John R. Pelletier, Sc.D., performed an independent peer review from a behavioral medicine perspective and issued a report on June 22, 2017.  (AR 788-95.)  Dr. Pelletier's conclusions are cited below as part of the medical evidence.  A second peer review on appeal was performed by Board certified internal medicine physician, Gary Nudell, M.D., who assessed Plaintiff's physical condition and issued a report on June 23, 2017.  (AR 798-804.)  His conclusions are also cited below as part of the medical evidence.

---

[7] Prior to appealing, Plaintiff's counsel submitted records from Dr. Nassar, Steven D. Mathews, M.D. and Rosalyn Crawford, M.D.  (AR 910.)

In correspondence dated July 10, 2017, Aetna notified Plaintiff of its decision to uphold the termination of her LTD benefits as of December 1, 2016, because there was "no support for a functional impairment from mental illness or behavioral health conditions or as a result of a physical medicine condition." (AR 806-08; *see also* AR 443.) Aetna again acknowledged that Plaintiff was approved for SSDI benefits, by stating:

> We understand that [you] were approved for [SSDI] benefits. However, our disability determination and the [SSDI] determination are made independently and are not always the same. The difference between our determination and the [SSDI] determination may be driven by the [SSA] regulations. For example, SSA regulations require that certain disease[s]/diagnoses or certain education or age levels be given heavier or even controlling weight in determining whether an individual is entitled to [SSDI] benefits. Or, it may be driven by the fact that we have information that is different from what [the] SSA considered. Your Social Security award was dated April 12, 2016[,] which is more than 12 months ago and is no longer current. We have new[,] more relevant information that our review has been based upon. Therefore, even though you are receiving [SSDI] benefits, we are unable to give it significant weight in our determination, and we find that you are no longer eligible for LTD benefits based on the [P]lan definition of Totally Disabled quoted above.

(AR 807-08.) Aetna concluded that Plaintiff no longer met the test of disability under the Plan, primarily based on the reports of the peer reviewers, Dr. Pelletier and Dr. Nudell. (AR 806-07.) Plaintiff filed this lawsuit on July 19, 2017. (Doc. 1.)

### C.    Records Most Pertinent to the Issues

#### 1.    Plaintiff's Treating Sources

14

a.      **Lielanie Aguilar, M.D., Psychiatry**

Dr. Aguilar started treating Plaintiff for GAD and depressive disorder on

July 13, 2015.  (AR 319; *see also* AR 1701-04 (a progress note from July 13,

2015), AR 1743-45 (a behavioral health clinician statement completed July 21,

2015), AR 1699 (a progress note from July 29, 2015), AR 2149-50 (a progress

note from August 26, 2015), AR 1695 (a progress note from September 9, 2015),

AR 1735-36 (a questionnaire from September 16, 2015 for Aetna), AR 1263 (a

progress note from October 9, 2015), AR 1732 (an attending provider statement

dated October 9, 2015), AR 1261 (a progress note from November 6, 2015), AR

1722-24 (a questionnaire from November 6, 2015 for Aetna), AR 1259 (a

progress note from December 15, 2015).)  On December 15, 2015, Dr. Aguilar

opined that Plaintiff was likely to have a full recovery in three to six months.  (AR

319.)

In a letter dated January 8, 2016, Dr. Aguilar stated: "[Plaintiff] has

significant . . . anxiety episodes that manifest as shaking, crying and difficulty

breathing that make her unable to leave the house and drive.  It makes it difficult

for her to be in public and big crowds.  She has anxiety when going to work."  (AR

1218.)  She continued treating Plaintiff throughout 2016.  (*See* AR 1202-03 (a

progress note from January 22, 2016), AR 1200-01 (a progress note from

February 23, 2016), AR 1198-99 (a progress note from March 31, 2016), AR

1673 (a letter dated March 31, 2016, excusing Plaintiff from work until her next

appointment), AR 1193-94 (a progress note from May 5, 2016), AR 1195-97 (a

progress note from June 8, 2016).)  In a letter dated June 8, 2016, Dr. Aguilar

stated that as of Plaintiff's last visit that same day, she "continues to have

symptoms that impair her ability to return to work."  (AR 1192.)  On the same day,

Dr. Aguilar wrote another letter excusing Plaintiff "from work until her next

appointment in a month's time."  (AR 1609.)

     On July 1, 2016, Plaintiff saw Dr. Aguilar for a follow-up.  (AR 999.)  The

treatment note provides:

> [Plaintiff] says that her anxiety is getting better[,] although she still
> rates it a 6-7 (10 being the worst). . . .  She reports that she has not
> had any anxiety attack[s] in 3 weeks.  She adds that she has been
> sleeping soundly.  She had previously rated her mood a 2-3 saying
> she felt happy 70-80% of the time.

(*Id.*)  Dr. Aguilar noted that Plaintiff was "not shaking," her affect was "less

anxious and not tearful," her anxiety was improving, and her mood was better.

(*Id.*)  On July 18, 2016, Dr. Aguilar wrote a letter, stating that as of Plaintiff's last

visit on July 1, 2016, she "continues to have symptoms that impair her ability to

return to work."  (AR 1006.)

     At her August 4, 2016 follow-up, Plaintiff complained of chronic fatigue.

(AR 1001.)  The treatment note provides:

> She says that her anxiety is getting better and she rates it a 5 from
> the [previous] 6-7 (10 being the worst). . . . She has been doing more
> errands regularly. . . . She has not had any anxiety attacks in 2
> months now.  She has not taken Klonopin in 2-3 weeks.  She adds
> that she has been sleeping well but she has "jerking" in her sleep.

> She rates her mood a 2-3 saying she feels happy 80% of the time.
> Her energy is low[,] but she thinks it is more due to her thyroid
> hormones.

(*Id.*)  Dr. Aguilar noted that Plaintiff was "not shaking," her affect was "less

anxious and not tearful," her anxiety was improving, her mood was better, but her

insight and judgment were limited.  (*Id.*)

On September 15, 2016, Dr. Aguilar completed a questionnaire, noting that

Plaintiff was "presenting well during the sessions" with no shaking or tearfulness,

there had been "[n]o recent medication changes as she ha[d] been improving,"

and that her symptomatology did not warrant a referral to a high level of care,

such as an intensive outpatient program ("IOP") or a partial hospitalization

program ("PHP").  (AR 997-98.)  Dr. Aguilar stated:

> Her anxiety has been improving.  She has been able to go out [and]
> do more errands.  She has not (as of 8/4 when I last saw her) had
> anxiety attacks recently.  It is hard to say whether or not she will be
> able to perform her job functions until she goes back to work.

(AR 997.)

On October 4, 2016, Plaintiff saw Dr. Aguilar for a follow-up.  (AR 967.)

Plaintiff reported that "her anxiety ha[d] been at a 6-7 (10 being the worst), she

"ha[d] not had any anxiety attacks in 2-3 months," she "ha[d] not taken Klonopin

recently," she felt "happy 80% of the time," and her mood was "better."  (AR 615,

967.)  Dr. Aguilar's assessment was less anxious and not tearful affect, and

limited insight and judgment.  (AR 967.)

### b. Audrey Dearborn, LMHC, Biofeedback Associates

Plaintiff has attended counseling sessions for her GAD and generalized depression at Biofeedback Associates since August 5, 2015.  (AR 356.)  On October 20, 2015, Ms. Dearborn opined:

> Since starting our sessions[,] [Plaintiff] has shown signs of extreme anxiety due to work place issues and social anxieties.
> She has difficulty [performing] daily tasks due to lack of sleep and chronic pain due to her fibromyalgia.  Her panic attacks have increased in frequency and duration due to her inability to continue living a productive life, [a] normal life.  She demonstrates incongruence in her emotions, affect, display and feelings.
> [Plaintiff] will need at least six months of in-depth counseling to help her adjust and cope with work demands and her issues with social anxiety.[8]

(*Id.*)

In December 2015, Ms. Dearborn completed a questionnaire for Aetna, opining that Plaintiff could possibly return to work in April 2016, but there was no return-to-work plan, because she was still experiencing panic attacks, migraines, and daytime sleepiness.  (AR 327-28.)  During the weekly sessions, they were working towards lowering Plaintiff's anxiety level through relaxation techniques and sleep improvement.  (AR 327.)

On January 27, 2016, Ms. Dearborn sent a letter to the SSA, reiterating her opinions expressed on October 20, 2015 and further opining that Plaintiff was

---

[8] This is in line with Dr. Ann Grenadier's October 20, 2015 opinion.  (AR 1728 (recommending, *inter alia*, that Plaintiff stay home from work until April 1, 2016).)

"not at [that] time capable of performing even basic work duties and self-care tasks at home."  (AR 1007.)  Ms. Dearborn attached a synopsis of Plaintiff's counseling visits for the period of August 5, 2015 through January 27, 2016, which indicated, *inter alia*, panic attacks, depression, memory issues, confusion, insomnia, poor concentration, low energy, low motivation, dizziness, high pain level, headaches, and tremors in her extremities.  (AR 1008-10.)

On February 2, 2016, Ms. Dearborn sent a letter to Aetna, recommending that Plaintiff be provided an extension of her personal medical leave, as she was incapable of "performing even basic work duties and self-care tasks at home." (AR 1473.)  Session notes for the period of March 8, 2016 through October 19, 2016 indicated, *inter alia*, panic attacks, restlessness, confusion, insomnia, poor concentration, low energy, low motivation, headaches, and fibromyalgia.  (AR 970-72.)

On May 3, 2016, Ms. Dearborn sent a letter to Aetna, recommending that Plaintiff return "to work beginning June 3, 2016 while continuing at least six-months of in-depth counseling to help her adjust and cope with work demands and her issues with social anxiety."  (AR 1672.)  In a letter dated June 29, 2016, Ms. Dearborn recommended that Plaintiff "stay home until at least August 15, 2016 when she [would] have completed several more counseling appointments." (AR 1053.)  On September 27, 2016, Ms. Dearborn noted that Plaintiff "missed [an] appointment due to [a] high pain level and lack of sleep."  (AR 971.)  On

19

October 12, 2016, she noted that Plaintiff "missed another appointment due to [her] inability to complete even personal hygiene- feeling lethargic- not sleeping." (AR 972.)

The session note from October 19, 2016 indicated a high pain level, a cognitive impairment, and continued nightmares and panic attacks. (*Id.*) In a letter dated October 19, 2016, Ms. Dearborn opined that Plaintiff "need[ed] to be off work to concentrate on getting well" due to "problems with sleep apnea, migraines, panic attacks, fibromyalgia, fatigue and blocked concentration." (AR 991.) Ms. Dearborn added: "Her energy levels continue to be low due to her sleep issues and anxiety disorders. I will not release her to work in any capacity[,] but will reevaluate in January of 2017." (*Id.*) She explained:

> In my opinion[,] there is minimal improvement in her anxiety level[,] but she continues to have health related issues[,] which are being addressed by her medical team. Methods of treatment include[,] but are not limited to[,] visualization, relaxation training and self-soothing techniques. . . . During our session[s,] [Plaintiff] tires easily and has issues with concentration. Cognitively[,] she often becomes distant and relates issues with energy levels. These low energy levels impair her ability to stay on task and complete even menial tasks. . . . She is impacted daily by her high pain level. . . . [Plaintiff] has been a client here since 8/5/2015 [and] during that time[,] I have witnessed an increase in her physical issues which have seriously s[l]owed her mental improvement.

(*Id.*)

### c.   Joshua E. Shannon, Ph.D.

On June 15, 2016, Dr. Shannon performed a mental status examination

over three sessions with Plaintiff and issued a report.  (AR 1153-56.)  He stated:

> The patient reports excessive daytime sleepiness, she states she
> may take from 1-2 naps a day, the naps range 30 minutes to four
> hours depending [on] how bad the fatigue is during the day. . . .
> The patient has halted ability for registration and recall as
> demonstrated by giving verbal cues.  Immediate memory [3-5
> minutes] seems halted.  With regard to her behavior, eye contact
> was good; her thought process was halted by demonstrated lack of
> concentration.  She was unable to do simple addition and subtraction
> in her head, she was unable to count backwards by 7s from 200. . . .
> [S]he has times where she has difficulty pronouncing words.  She
> has a previous diagnosis of Fibromyalgia, she states she has [] "fog"
> in her head that makes it hard for her to recall immediate memory.
> She also has sleep apnea and idiopathic hypersomnia.
>
> She states that she often gets fidgety in her chair.  Her concentration
> and recall [were] poor[,] she was very centered on communicating
> her difficulty to maintain control over many areas of her life[,] to
> include every day functioning.
> . . .
> The thought process flow is logical[,] although her mood goes from
> animated to somewhat flat. . . . Mood is dysphoric, anxious and
> appropriate to reported health concerns. . . . [H]er cognition is halted
> at best, during the interview, moving toward poor.
> . . .
> When we spoke about telecommuting [working from home,] the
> patient stated that due to the chronic nature and the fact [that] she is
> always tired, it would be virtually impossible for her to maintain a
> telecommuting job.

(AR 1153-54.)

Dr. Shannon assessed a major depressive disorder, recurrent, without

psychotic features; a post traumatic stress disorder ("PTSD"), chronic due to both

past trauma and current medical condition; fibromyalgia, sleep apnea, idiopathic

hypersomnia, and adrenal gland disorder; and a Global Assessment of

Functioning ("GAF") score of 43.[9]  (AR 1155.)  Dr. Shannon concluded, from a

behavioral health perspective, that "the patient is currently disabled to her own

and any and all occupations at the time of evaluation."  (*Id.*)

### d.     Peter A. Nassar, M.D., Jacksonville Sleep Center

Dr. Nassar has treated Plaintiff for hypersomnia since 2010.  (*See* AR

1252-55 (noting the July 29, 2010 and August 26, 2010 diagnostic

polysomnography studies were normal), AR 1238 & 1250-51 (an office visit note

from December 8, 2011), AR 1236-37 (an office visit note from June 12, 2012),

AR 1234-35 (an office visit note from December 12, 2012), AR 1232-33 (an office

visit note from June 12, 2013), AR 1230-31 (an office visit note from June 19,

2014), AR 1227-29 (an office visit note from December 10, 2014); AR 1224-26

(an office visit note from June 9, 2015); AR 1221-23 (an office visit note from

December 8, 2015).)

---

[9] The GAF scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV ) at 32 (4th ed. 1994).  A GAF score of 41-50 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting), OR serious impairment in social or occupational functioning (*e.g.*, no friends, unable to keep a job).  *Id.*

In a letter dated January 7, 2016, Dr. Nassar stated: "[Plaintiff] has severe daytime sleepiness that affects her daytime functionality.  This[,] combined with depression and anxiety[,] has become debilitating.  In my opinion[,] she does not have the functional capacity for work at this time and at least short-term disability should be considered."  (AR 1219.)

On February 8, 2016, Plaintiff returned to Dr. Nassar for a follow-up of her excessive daytime sleepiness and hypersomnia.  (AR 1170.)  She was diagnosed with, *inter alia*, idiopathic hypersomnia, without long sleep time, and morbid obesity.  (AR 1171.)  A sleep study performed on February 29, 2016 indicated OSA and nocturnal hypoxemia.  (AR 1173-74.)  On March 14, 2016, Plaintiff underwent an attended overnight polysomnography titration to assess the effects of continuous positive airway pressure ("CPAP") therapy.  (AR 1175-76.)  Plaintiff's diagnosis was OSA.  (AR 1176.)

On May 9, 2016, Plaintiff presented to Dr. Nassar for an evaluation.  (AR 1165.)  He assessed, *inter alia*, moderate OSA, idiopathic hypersomnia without long sleep time, and a body mass index ("BMI") of 45.0-49.9.  (AR 1168.)  Dr. Nassar stated: "Utilizing auto [bilevel positive airway pressure (BiPAP)] 6-14 cm H2O with great efficacy and great compliance. . . . Structured exercise and diet regimen discussed in detail.  Importance of weight loss discussed."  (*Id.*)

In correspondence dated July 12, 2016, Dr. Nassar advised: "[Plaintiff] has severe daytime sleepiness that affects her daytime functionality.  This[,]

23

combined with depression and anxiety[,] has become debilitating." (AR 1054.)

He opined that Plaintiff "does not have the functional capacity for work at this time

and at least short-term disability should be considered." (*Id.*)

On December 19, 2016, Plaintiff saw Dr. Nassar for a follow-up of her

moderate OSA and persistent daytime sleepiness. (AR 887.) Dr. Nassar noted:

> [Plaintiff] continues to utilize BiPAP on a nightly basis. Therapeutic
> [Apnea/Hypopnea Index (AHI) is] 0.8 indicating excellent efficacy.
> Average nightly sleep time is 10 hours. She is attempting pregnancy
> and hence has discontinued Nuvigil. She is on multiple fertility
> medications. [S]he does complain of daytime sleepiness. Weight is
> up 8 pounds since her last visit. Total sleep time is more than
> adequate. She averages 10 hours nightly of BiPAP therapy.

(*Id.*) Dr. Nassar diagnosed moderate OSA, idiopathic hypersomnia without long

sleep time, obesity, and depression. (AR 890.)

On April 5, 2017, Dr. Nassar wrote a letter stating:

> [Plaintiff] is under my care for [OSA] and also idiopathic
> hypersomnia. Daytime sleepiness continues to be a persistent
> issue. Confounding her situation is also depression and anxiety. At
> the current time[,] her functional status is significantly compromised.
> I would support her application for disability coverage on this basis. I
> remain positive that functional status will improve and hopefully she
> will be back to work within one year.

(AR 886.)

### e.    Steven D. Mathews, M.D., Rheumatology

On November 3, 2016, Dr. Mathews evaluated Plaintiff for myalgias in her

hands and feet. (AR 897.) He noted she had been diagnosed with fibromyalgia

ten years earlier.  (*Id.*)  On examination, there was tenderness on palpation of the upper and lower extremities, and the cervical spine, among others.  (AR 899.)

On January 5, 2017, Plaintiff presented to Dr. Mathews with stiffness and arthralgia(s) in the bilateral feet and hands.  (AR 892.)  On examination, there was tenderness on palpation of the upper arm musculature, the bilateral thighs, the thoracic and lumbar spine, and the calf, among others.  (AR 894.)

On June 8, 2017, Dr. Mathews wrote a letter, stating: "I am a Rheumatologist who is following [Plaintiff] for diffuse joint pain involving multiple joints.  These symptoms have been longstanding and unresponsive to medical therapy.  I will certainly support [Plaintiff's] disability case as much as her clinical condition will allow."  (AR 849.)

### f.      Rosalyn Crawford, M.D., Baptist Primary Care - Endocrinology

On December 5, 2016, after reviewing Plaintiff's test results, Dr. Crawford assessed, *inter alia*, abnormal thyroid function and congenital adrenal hyperplasia.  (AR 903, 905.)

### g.      Sofija Rak, M.D., Baptist Primary Care

On April 24, 2017, Plaintiff presented to Dr. Rak to establish care.  (AR 854.)  On examination, she had joint pain and swelling, back pain, and muscle weakness.  (AR 855.)  She was assessed with hyperlipidemia, morbid obesity, vitamin B12 deficiency, vitamin D deficiency, congenital adrenal hyperplasia,

fibromyalgia, migraines, depression, and anxiety.  (AR 858.)  Her fibromyalgia

and migraines were stable, and she was advised to follow a heart healthy diet,

exercise, and lose weight.  (*Id.*)

### 2.    Independent Medical Evaluation ("IME") by David A. Libert, M.D.

On May 23, 2017, Dr. Libert, a family practitioner, performed a disability

evaluation and reviewed certain medical records at Plaintiff's request.[10]  (AR 820,

867.)  On examination, Dr. Libert noted multiple trigger points along Plaintiff's

neck, back, chest, shoulders, elbows, arms, hands, legs, hips, knees, ankles, and

feet.  (AR 820-21.)  He assessed OSA, idiopathic hypersomnia, fibromyalgia, and

migraine headaches.  (*Id.*)  He opined:

> As a result of the medical conditions listed above, the patient is
> unable to continue her occupation as a foreclosure specialist.  The
> patient is also unable to continue any occupation and is permanently
> and totally disabled from performing any occupation as a result of the
> medical conditions listed above.

(AR 821.)

### 3.    Aetna's Peer Review Consultants

### a.    Jeremy Hertza, Psy.D.

---

[10] Dr. Libert reviewed Dr. Mathews's office notes dated November 3, 2016 and
January 5, 2017, Dr. Crawford's December 5, 2016 treatment note and December 8,
2016 lab data, and Dr. Nassar's December 19, 2016 treatment note and April 5, 2017
letter.  (AR 820.)

Following a review of pertinent medical records,[11] on July 15, 2016, Dr.

Hertza issued a report, advising that Plaintiff was functionally impaired, from a

psychological perspective, from July 8, 2015 through the date of the report.  (AR

1031-41.)  His report provided, in relevant part:

> [Plaintiff] reported significant cognitive dysfunction and a mental
> status exam suggested halting condition with poor attention.
> Function was significantly limited from a psychological perspective.
> The claimant struggled to pay attention, stay motivated, engage with
> others, rest/sleep, and manage emotions.  She was reactive and
> essentially tired and fatigued continuously.  This had dramatically
> impacted her daily function.

(AR 1041.)

### b.    Tajuddin Jiva, M.D.

Following a review of pertinent medical records and a phone consultation

with Dr. Nassar, on July 26, 2016, Dr. Jiva issued a report, advising that Plaintiff

did not have any functional impairments, from a sleep medicine perspective, from

July 8, 2015 through August 1, 2016.  (AR 1023-30.)  Dr. Jiva did not agree with

Dr. Nassar's diagnosis of idiopathic hypersomnia, because "it is a diagnosis of

exclusion."  (AR 1028.)  Dr. Jiva explained:

> An accurate diagnosis of a specific hypersomnia disorder of central
> origin should be established.  The evaluation would be expected to
> include a thorough evaluation of other possible contributing causes
> of excessive daytime sleepiness. . . . The claimant has had several
> causes of daytime sleepiness, including obesity, weight gain,
> physical deconditioned status, lack of exercise, medications, and

---

[11] Dr. Hertza's attempts to reach Dr. Aguilar and Ms. Dearborn for a peer-to-peer
consultation were unsuccessful.  (AR 1040.)

[OSA]. . . . Dr. Nassar did not clarify how her symptom of sleepiness causes functional difficulty for her that she cannot function.  Her prior [Multiple Sleep Latency Test (MSLT)] from 7/29/2010 did not show evidence for hypersomnia or narcolepsy.  Dr. Nassar did not document objective medical evidence of sleepiness during his exam.  In fact, he documented that her vital signs were stable. . . . On 02/28/16, Dr. Peter Nassar documented that her sleep patterns are erratic and perpetuated by daytime napping.  Weight is increased by 64 lbs.  Dr. Nassar has not provided any objective documentation[,] including tests[,] to show the presence of severe daytime sleepiness[,] including MSLT and maintenance of wakefulness testing (MWT).  Therefore, in my opinion, the claimant is not functionally impaired in the absence of appropriate medical history of idiopathic hypersomnia and lack of objective medical evidence and testing[,] including MSLT/MWT.

(*Id.*)

### c.    John R. Pelletier, Sc.D.

At Aetna's request, Dr. Pelletier, who specializes in psychology, rehabilitation psychology, and neuropsychology, performed an independent peer review from a behavioral medicine perspective and issued a report on June 22, 2017.  (AR 788-95.)  The records submitted for Dr. Pelletier's review included, *inter alia*: Dr. Libert's independent medical evaluation dated May 23, 2017; Dr. Rak's records from April 24, 2017; Dr. Nassar's correspondence dated April 5, 2017, July 12, 2016, March 14, 2016, February 29, 2016, and February 8, 2016; Dr. Mathews's records from January 5, 2017 and November 3, 2016; Dr. Crawford's records from December 2016; Ms. Dearborn's correspondence from October 19, 2016, June 29, 2016, and May 3, 2016, and session notes from March 8, 2016 to October 19, 2016; Dr. Aguilar's records from October 4, 2016,

28

September 15, 2016, August 4, 2016, July 18, 2016, July 1, 2016, June 8, 2016, May 5, 2016, March 31, 2016, and February 23, 2016; Dr. Shannon's mental status examination of June 15, 2016; and SSA's correspondence dated April 12, 2016.  (AR 789.)  Dr. Pelletier advised that he had reviewed all these records in their entirety.  (AR 790-91.)

He further advised that his attempts to reach Dr. Aguilar for a peer-to-peer consultation were unsuccessful,[12] but he was able to reach Ms. Dearborn.  (AR 792-93.)  Ms. Dearborn "acknowledged that it was not possible to separate [Plaintiff's] chronic anxiety, depression, and reported problems in attention and memory from her physical problems."  (AR 793.)  Ms. Dearborn emphasized that Plaintiff "struggled to get dressed," was "challenged to keep her appointments[,] which she ha[d] been able to do," and was "very intelligent," but seemed to have given up. (*Id.*)

Based on his conversation with Ms. Dearborn and his review of the records, Dr. Pelletier opined "within reasonable medical probability [] that the clinical evidence available does not support [a] functional impairment due to the claimant's psychological conditions from 11/30/2016 and beyond."  (AR 794.)  Dr. Pelletier explained:

---

[12] As Dr. Pelletier was unable to reach Dr. Aguilar, his report was sent to Dr. Aguilar on June 26, 2017, giving her an opportunity to voice her agreement or disagreement with his conclusions, and to submit additional clinical evidence or observations supporting her own opinions.  (AR 787, 796.)  Dr. Aguilar did not respond. (*See* AR 807.)

As cited in the Clinical File Review, the most recent progress note from Dr. Lielanie Aguilar-Pascasio was dated [October 4, 2016] when the claimant was reported to have had no anxiety attacks in 2-3 months and being "happy 80% of the time." The claimant also reported no recent use of Klonopin and Dr. Lielanie Aguilar-Pascasio described her as alert and fully oriented, adequately groomed, as having "better" mood/affect, intact remote/recent memory, and [her] anxiety was improving with no medication side effects. This note was generally consistent with Dr. Lielanie Aguilar-Pascasio's prior note dated [September 15, 2016] when she also described the claimant as improving and noted that it was difficult to determine if she could perform her job functions until she actually goes back to work. Dr. Lielanie Aguilar-Pascasio then reported that the claimant was presenting well during sessions and she reported performing her personal hygiene, doing some chores, taking on projects at home, [driving], and going out with her husband.

Overall, Dr. Lielanie Aguilar-Pascasio's notes reflected a good response to treatment at that time and there was no evidence that indicated demonstrable impairment in the claimant's cognition, memory functioning, emotional regulation, and ability to perform daily tasks due primarily to her diagnosed conditions of GAD and unspecified depressive disorder.

A subsequent primary care note by Dr. Steven Mathews dated [November 3, 2016] described the claimant as having normal mood/affect and she was similarly described by Dr. Rosalyn Crawford, an endocrinologist, when she examined her on [December 5, 2016].

The medical records from Dr. Peter A. Nassar cited continued complaints of daytime sleepiness due to [OSA] when he saw the claimant on [December 19, 2016] and as noted in his letter of [April 5, 2017] when he reported that the claimant's function was compromised[,] yet without describing how she was impaired.

The most recent primary care note by Dr. Sofija Rak dated [April 24, 2017] cited the claimant's report of being on LTD for depression[,] with worsening symptoms due to her sleep disorder and fibromyalgia. However, Dr. Sofija Rak described the claimant as

having normal mood and she also noted that the claimant's fibromyalgia and migraine headaches were stable.

Lastly, my conversation with Audrey Dearborn, LMHC yielded her opinion that the claimant was unable to work because of the combination of her mental health and physical problems.  However, there were no medical records available from this provider during the timeframe for this review and her impressions of the claimant appeared largely based on the claimant's report of symptoms and without compelling evidence to support [a] functional impairment in the claimant's daily functioning and global functioning due primarily to her anxiety and depressive disorders.

Moreover, if the claimant's psychological conditions were resulting in [a] functional impairment, it is reasonable to expect that she would have been referred to and/or engaged in more appropriately intensive and evidence-based treatment for her anxiety and depressive disorders.  Therefore, based on the information available for review, there is no evidence to support [a] functional impairment during the timeframe for this review.

(AR 794-95.)

### d.    Gary Nudell, M.D.

On June 23, 2017, Dr. Nudell, a Board certified internal medicine physician, issued a report regarding Plaintiff's physical conditions and functionality from November 30, 2016 to the present.  (AR 798-804.)  The records submitted for Dr. Nudell's review included, *inter alia*: Dr. Libert's independent medical evaluation dated May 23, 2017; Dr. Rak's records dated April 24, 2017; Dr. Nassar's correspondence/records from April 5, 2017, July 12, 2016, March 14, 2016, February 29, 2016, February 8, 2016, January 7, 2016, December 8, 2015, June 9, 2015, and July 29, 2010-December 10, 2014; Dr. Mathews's records from

January 5, 2017 and November 3, 2016; Dr. Crawford's records from December

2016; Ms. Dearborn's correspondence from October 19, 2016, June 29, 2016,

May 3, 2016, January 27, 2016, and February 10, 2015, and her session notes

from March 8, 2016 to October 19, 2016; Dr. Aguilar's records from December

15, 2016, October 4, 2016, September 15, 2016, August 4, 2016, July 18, 2016,

July 1, 2016, June 8, 2016, May 5, 2016, March 31, 2016, February 23, 2016,

January 22, 2016, January 8, 2016, November 6, 2015, October 9, 2015,

September 9, 2015, August 26, 2015, July 29, 2015, and July 13, 2015; Dr.

Shannon's mental status examination of June 15, 2016; Emily Durik, LMHC's

adult intensive outpatient and group therapy notes of September 18, 2015; and

SSA's correspondence dated April 12, 2016 and January 5, 2016.  (AR 799-800.)

Dr. Nudell advised that he had "reviewed all of the records listed above."  (AR

800.)

He further advised that his attempts to reach Dr. Nassar for a peer-to-peer

consultation were generally unsuccessful,[13] but he was able to confer with Dr.

Rak, who advised that "there were no medical conditions restricting the claimant

from performing functional tasks/activities, and that any/all restrictions would have

been based on the claimant's psychiatric condition(s)."  (AR 803.)

---

[13] Dr. Nudell's report was sent to Dr. Nassar on June 27, 2017, giving him an
opportunity to voice his agreement or disagreement with Dr. Nudell's conclusions, and
to submit additional clinical evidence or observations supporting Dr. Nassar's opinions.
(AR 797.)  Dr. Nassar did not respond.  (*See* AR 807.)

After a review of the available information, Dr. Nudell concluded that "the

medical records [did] not support [a] functional impairment from [November 30,

2016] from [an] internal medicine perspective."  (AR 803; *see also* AR 804

("There were no restrictions/limitations from an internal medicine perspective.").)

Dr. Nudell explained:

> The claimant was diagnosed with [OSA] and hypersomnia dated
> back to at least 2010.  The medical records from December 2016
> documented moderate [OSA], well controlled on current [CPAP], with
> overall good sleep efficacy.  Although[] the claimant continued [sic]
> subjective complaints of fatigue, there were overall no clinical
> findings that supported [a] functional impairment as a result of her
> reported sleep disorder.  Objective evidence showed overall well
> controlled apnea.  A call to Dr. Peter Nassar was attempted but call
> back was not received for further discussion.
>
> The claimant was diagnosed with fibromyalgia.  While the claimant
> may have had subjective complaints of pain consistent with this type
> of diagnosis, there was overall no basis for [a] functional impairment
> as a result of this condition.  Examinations documented trigger points
> consistent with a diagnosis of fibromyalgia.  There were no other
> weaknesses or neurologic symptoms, or any other orthopedic
> restrictions that would support the need for [a] functional impairment.
>
> In regards to the claimant's congenital adrenal hyperplasia, there
> was no indication in the endocrinology records that this chronic
> condition would support the need for [a] functional impairment.
>
> Per my discussion with Dr. Sofija Rak, she did not feel there were
> any medical conditions that would support the need for [a] functional
> impairment.  I would begin [sic] defer any psychiatric
> restrictions/limitations to a qualified specialist in this field.

(AR 803-04.)

### III.   Standard of Review

### A.   Summary Judgment Standard[14]

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  "In an ERISA benefit denial case . . . in a very real sense, the district court sits more as an appellate tribunal than as a trial court.  It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary."  *Curran v. Kemper Nat'l Servs., Inc.*, Case No.: 01-14097, 2005 WL 894840, *7 (11th Cir. Mar. 16, 2005) (per curiam) (quoting *Leahy v. Raytheon Co.*, 315 F.3d 11, 17-18 (1st Cir. 2002)).  *Accord Clark v. Hartford Life & Accident Ins. Co.*, Case No.: 8:05-cv-67-T-23MAP, 2006 WL 890660, *2 (M.D. Fla. Apr. 6, 2006).

"[W]here the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exist, do not apply."  *Crume v. Metro. Life Ins. Co.*, 417 F. Supp. 2d 1258, 1272 (M.D. Fla. 2006).  As explained in *Crume*:

---

[14] Each party moves for entry of summary judgment in its favor.  In the alternative, Plaintiff seeks judgment in her favor pursuant to Fed.R.Civ.P. 52.  (*See* Doc. 17 at 1 n.1.)

> In a case like this, where the ultimate issue to be determined is whether there is a reasonable basis for a claims administrator's benefits decision, it is difficult to ascertain how the "normal" summary judgment rules can sensibly apply.  After all, the pertinent question is not whether the claimant is truly disabled, but whether there is a reasonable basis in the record to support the administrator's decision on that point.  In other words, conflicting evidence on the question of disability cannot alone create an issue of fact precluding summary judgment, since an administrator's decision that rejects certain evidence and credits conflicting proof may nevertheless be reasonable.

*Id.* at 1273.  *See also Pinto v. Aetna Life Ins. Co.*, No. 6:09-cv-1893-Orl-22GJK, 2011 WL 536443, *8 (M.D. Fla. Feb. 15, 2011) ("There may indeed be unresolved factual issues evident in the administrative record, but unless the administrator's decision was wrong, or arbitrary and capricious, these issues will not preclude summary judgment as they normally would.").

### B.    ERISA Standard of Review

ERISA authorizes a plan participant or beneficiary "to recover benefits due to [her] under the terms of [the] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  A claimant suing under this provision bears the burden of proving her entitlement to contractual benefits; however, if an insurer claims that a specific policy exclusion applies to deny the insured benefits, then the insurer must generally prove the exclusion prevents coverage.  *See Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) (citing *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992)).  Nevertheless,

where at issue is a limitation provision merely limiting the amount of benefits that may be received once a claim is granted, rather than an entire exclusion from benefits, the burden of proof remains with the claimant.  *Aleksiev v. Metro. Life Ins. Co.*, 2012 U.S. Dist. LEXIS 183417, *38-39 (N.D. Ga. Mar. 9, 2012) (citing *Doe v. Hartford Life & Accident Ins. Co.*, 2008 U.S. Dist. LEXIS 103524, *12-13 n.1 (D.N.J. Dec. 22, 2008)).

> ERISA provides no standard for reviewing decisions of plan administrators or fiduciaries.  However, the Supreme Court in *Firestone* [*Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989),] established three distinct standards for reviewing an ERISA plan administrator's decision: (1) *de novo* where the plan does not grant the administrator discretion; (2) arbitrary and capricious where the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where the plan grants the administrator discretion and the administrator has a conflict of interest.

*Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195 (11th Cir. 2010) (citations omitted).

In the Eleventh Circuit, the *Firestone* test was expanded into a six-step analysis:

1.      Was the administrator's decision wrong, *i.e.*, does the Court disagree with the decision under a *de novo* standard of review?

2.      If the Court disagrees with the administrator's decision, was the administrator vested with discretion under the ERISA Plan in reviewing claims?

3.      If the administrator had discretion, was its decision arbitrary and capricious,[15] *i.e.*, lacking reasonable grounds?

4.      If there were reasonable grounds for the decision, was the administrator acting under a conflict of interest?

5.      Assuming no conflict of interest, the decision should be affirmed.

6.      If there was a conflict of interest, review the decision under the heightened arbitrary and capricious standard.

*See id.*

However, the Eleventh Circuit recognized that *Metropolitan Life Insurance Company v. Glenn*, 554 U.S. 105 (2008), implicitly overruled the heightened arbitrary and capricious standard in step six above, by clarifying that "the existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious."  *Doyle v. Liberty Life Assurance Co.*, 542 F.3d 1352, 1360 (11th Cir. 2008).  Further, "the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest."  *Id.*

"If the *de novo* standard applies, a district court reviewing a benefits determination 'is not limited to the facts available to the Administrator at the time

---

[15] In ERISA, the terms "arbitrary and capricious" and "abuse of discretion" are used interchangeably.  *Townsend v. Delta Family-Care Disability & Survivorship Plan*, 295 F. App'x 971, 976 (11th Cir. 2008).

of the determination.'" *Crume*, 417 F. Supp. 2d at 1271.  "[I]f the arbitrary and capricious standard applies, 'the administrator's fact-based determinations will not be disturbed if reasonable[,] based on the information known to the administrator at the time the decision was rendered.'" *Id.*  "As long as the decision had a reasonable basis, it 'must be upheld as not being arbitrary and capricious, even if there is evidence that would support a contrary conclusion.'" *Murray v. Hartford Life & Accident Ins. Co.*, 623 F. Supp. 2d 1341, 1352 (M.D. Fla. 2009) (citing *White v. Coca-Cola Co.*, 542 F.3d 848, 856 (11th Cir. 2008)).

Here, Defendant was vested with sufficient discretion under the Plan to trigger the deferential arbitrary and capricious standard.[16]  *See Crume*, 417 F. Supp. 2d at 1271 (stating that this court has applied the arbitrary and capricious standard when the plan provides that the administrator's "determinations shall be final and conclusive" so long as they are "reasonable determinations which are not arbitrary and capricious").  Thus, even if the Court determines that Defendant's decision was *de novo* wrong, it should still be upheld so long as there was a reasonable basis for the decision "based upon the facts as known to the administrator at the time the decision was made."  *Townsend*, 295 F. App'x at 976; *see also Pinto*, 2011 WL 536443 at *9 (starting the analysis at step two, as if defendant's "decision, were it reviewable under the *de novo* standard, was in fact

---

[16] Defendant admits that it "had discretionary authority to review claims and determine eligibility for benefits."  (Doc. 15 at 13 n.2; *see also id.* at 2 (citing AR 2507).)

wrong," where the defendant had discretion under the policy over both the eligibility determinations and the term construction).  "If the 'evidence is close,' then the administrator did not abuse its discretion, and the requisite deference compels the affirmance of the administrator's decision."  *Richey v. Hartford Life & Accident Ins. Co.*, 608 F. Supp. 2d 1306, 1310 (M.D. Fla. 2009).

## IV.   Analysis

Plaintiff challenges Aetna's July 10, 2017 decision, which upheld the termination of her LTD benefits as of December 1, 2016, after concluding that there was "insufficient evidence of [a] functional impairment in [Plaintiff's] physical or mental capacity that would preclude [her] from performing [her] own sedentary occupation as defined by [the LTD Plan]."[17]  (AR 776-80, 806-08.)  Plaintiff argues that Defendant's decision was "wrong, unreasonable, and unreasonable in light of its conflict of interest."  (Doc. 25 at 1.)

Specifically, Plaintiff contends that Aetna has not addressed her ability to perform the material and substantial duties of her own occupation as a Foreclosure Specialist II.  (*Id.*)  According to Plaintiff:

> The primary purpose of [her] own occupation was preparing bids on foreclosed properties, not the clerical process of servicing foreclosures themselves. . . . [Plaintiff's] promotion from Foreclosure Specialist to Foreclosure Specialist II substantially increased the administrative duties of her own occupation in a manner completely ignored by Aetna. . . . [Plaintiff's own] . . . detailed description of her

---

[17] Plaintiff states that the period at issue in this litigation is from January 6, 2016 to July 8, 2017.  (Doc. 17 at 7-8.)

> responsibilities [makes it] clear that she was diligently preparing bids
> on foreclosed homes and performing a multitude of associated tasks
> in connection with preparing bids on foreclosed homes for [BOA].
> Aetna presents a considerably less accurate vision of [Plaintiff's] own
> occupation.

(*Id.* at 5-7 (citations omitted).)  Plaintiff continues:

> The actual DOT description for MORTGAGE CLERK 249.362-014
> does not contain the words Foreclosure Specialist II and also does
> not contain the description beginning "Works closely with foreclosure
> attorneys..." which appears between the two references to the DOT
> code and title MORTGAGE CLERK (financial).  The actual DOT for
> Mortgage Clerk does mention Foreclosure Clerk (financial), but that
> is still a clerical position servicing foreclosures rather than an
> administrative position preparing bids on foreclosed properties.  The
> end result is a hybrid vocational report which falsely suggests by
> implication that a Foreclosure Specialist II is a form of Mortgage
> Clerk.

(*Id.* at 8.)  She adds: "A well-reasoned benefits decision must consider all

essential job duties.  Aetna's use of the inaccurate DOT entails skills that

[Plaintiff] did not use in her own occupation and doesn't include skills [that

Plaintiff] did use in her own occupation, undermining its decision."  (Doc. 17 at 12

(footnotes omitted).)

Plaintiff contends that her disability "is readily apparent from her vivid

detailed description" of her own occupation, and, as such, "Aetna's decision is *de

novo* wrong."  (Doc. 25 at 13.)  Plaintiff further contends that since Aetna's

decision is based on an inaccurate job description, it is also unreasonable, and

arbitrary and capricious, because it allegedly fails to comply with the

requirements of a full and fair review.  (Doc. 17 at 16.)  Plaintiff maintains: "The

fact that the DOT does not have a listing for Foreclosure Specialist II does not make Aetna's decision any less arbitrary."  (*Id.* at 17 (footnote omitted).)  The undersigned is not persuaded by any of Plaintiff's arguments with respects to the description of her own occupation.

At the time her period of disability began, Plaintiff's job title was Foreclosure Specialist II.  Under the terms of the Plan, in determining Plaintiff's "own occupation," Defendant was not limited to looking at the way Plaintiff performed her job as a Foreclosure Specialist II for her specific employer or at her location or work site.  (AR 2421.)  Rather, Defendant was entitled to look at the way the occupation was "normally performed in the national economy."  (*Id.*)

In determining how the occupation was normally performed in the national economy, Defendant was justified in looking at the DOT classification.  *See Stiltz v. Metro. Life Ins. Co.*, 244 F. App'x 260, 264 (11th Cir. 2007) (per curiam) (finding that where the "clear plan language allowed MetLife to look beyond the requirements of 'the specific position' Stiltz held[,] MetLife was entitled to rely on the Dictionary of Occupational Titles . . . , and consider the job description provided by Stiltz's employer"); *Cook v. Standard Ins. Co.*, No. 6:08-cv-759-Orl-35DAB, 2010 WL 807443, *9-10 (M.D. Fla. Mar. 4, 2010) (stating that defendant "was entitled to rely on the DOT's classification exclusively" for its "own occupation" determination, where the plan allowed defendant to "look at the way the occupation is generally performed in the national economy"); *Richards v.*

41

*Hartford Life & Accident Ins. Co.*, 356 F. Supp. 2d 1278, 1287 (S.D. Fla. 2004)

("The plain language of the Policy directed Hartford to evaluate Plaintiff's ability to

perform her occupation as it is generally recognized in the workplace. . . . Even if

the Policy left the term 'Your Occupation' undefined, Plaintiff would still be

unsuccessful in arguing that Hartford should have evaluated her capabilities to

perform her particular tasks.  When the term 'occupation' is undefined, courts

properly defer to the [DOT] definition of the term because insurers issuing

disability policies 'cannot be expected to anticipate every assignment an

employer might place upon an employee outside the usual requirements of his or

her occupation.'"); *see also Conway v. Reliance Standard Life Ins. Co.*, 34 F.

Supp. 3d 727, 733 (E.D. Mich. 2017) (approving defendant's reliance on the DOT

in defining the material duties of Plaintiff's occupation as it is performed in the

national economy); *Carlson v. Standard Ins. Co.*, 920 F. Supp. 2d 1028, 1033

(W.D. Mo. 2013) (concluding that the term "own occupation" was properly defined

as the "participant's occupation as it is generally performed in the national

economy," and, as such, the defendant "was not limited to looking at the way

[p]laintiff performed her job, specifically").

Given that Plaintiff's exact job with her employer was not defined in the

DOT, Defendant properly used "the most closely analogous" DOT-recognized

occupation,[18] namely, the job of a Mortgage Clerk, DOT code 249.362-014.[19]

*Pinto*, 2011 WL 536443 at *12.  A DOT occupation is appropriately analogous if it

---

[18] Plaintiff does not argue that there is another occupation in the DOT, which is more closely analogous to her job.

[19] Defendant adopted the DOT description in full and added the following paragraph: "Works closely with foreclosure attorneys and trustees and services the foreclosure during the process.  Monitors many different queues and applications to ensure the process is moving, and executes daily reports with time sensitive material." (AR 58.)  Citing to *Viglietta*, Plaintiff argues that Defendant's decision was premised on an inaccurate job description, and, as such, was arbitrary and capricious.  *See Viglietta v. Metro. Life Ins. Co.*, No. 04 Civ.3874 LAK, 2005 WL 5253336, *9 (S.D.N.Y. Sept. 2, 2005) ("[E]ven if an administrator provides substantial medical evidence to support its decision, if that decision and the evidence used to support it are based on incorrect premises, such as an inaccurate job description, the decision is necessarily arbitrary and capricious.").  However, to the extent Plaintiff suggests that it was improper to use "a hybrid vocational report," her argument appears to be without merit.  *See Stiltz*, 244 F. App'x at 264 (finding that where the "clear plan language allowed MetLife to look beyond the requirements of 'the specific position' Stiltz held[,] MetLife was entitled to rely on the Dictionary of Occupational Titles . . . , and consider the job description provided by Stiltz's employer," which, in that case, was consistent with the DOT); *Becker v. Hartford Life & Accident Ins. Co.*, No. 8:05-cv-551-T-26MAP, 2006 WL 1360928, * 6 (M.D. Fla. May 17, 2006) (finding that "Hartford Life was not wrong when it applied the DOT's definition and the employer's definition to Plaintiff's occupation as a General Manager"); *Kiloh v. Hartford Life Ins. Co.*, No. 8:04CV1741T24TGW, 2005 WL 2105957, *9 n.3 (M.D. Fla. Aug. 31, 2005) (rejecting plaintiff's argument that defendant was wrong in using the DOT in lieu of considering the actual duties that plaintiff performed, because "it is reasonable for claims administrators to consider the DOT when making disability determinations," and defendant "did not exclusively rely on the DOT," but also "considered the job description for Plaintiff's position that was prepared by his employer"); *see also Green v. Reliance Standard Life Ins. Co.*, No. 408CV068, 2009 WL 1956290, *7 (S.D. Ga. July 7, 2009) (finding that it was proper for defendant to rely on two titles in the DOT to capture plaintiff's duties where "no single occupational title in the DOT accurately reflected [plaintiff's] occupation").  Of note, "Plaintiff did not specifically compare and contrast the duties of her job as [a Foreclosure Specialist II] with those set forth in the DOT description" and/or Defendant's description of a Mortgage Clerk.  *Rodriguez v. Liberty Life Assurance Co. of Boston*, No. 8:05-CV-1295-T-24TBM, 2006 WL 3201871, *12 (M.D. Fla. Nov. 3, 2006).  As such, even assuming that the job duties were materially different, Plaintiff does not explain what particular duties she is unable to perform, other than suggesting that her job at BOA was very stressful and demanding.

43

involves duties that are "comparable" to those of the claimant's occupation, but

"not necessarily every duty."  *Richards*, 356 F. Supp. 2d at 1287 (internal citations

omitted); *Conway*, 34 F. Supp. 3d at 733-34 (finding it was appropriate to use the

DOT to define the material duties of plaintiff's regular occupation, "because the

duties that the DOT enumerates are not substantially different from those that

[p]laintiff actually performed"); *Green*, 2009 WL 1956290 at *8 (finding that the

descriptions need not be "identical," as long as the description relied upon by

defendant "adequately reflect[s] the character of [plaintiff's] occupation"); *see also*

*Black v. Long Term Disability Ins.*, No. 04C1230, 2007 WL 2821997, *8 (E.D.

Wis. Sept. 27, 2007) ("[E]ven if plaintiff hypothetically could not perform her job as

Executive Director for MWF, to meet the definition of disability under the relevant

policy language, she also would have to be unable to perform *jobs of a generally*

*similar character across the country*.") (emphasis added).

As Defendant points out, the duties of a Mortgage Clerk in the DOT and as

described by Defendant are comparable to those of a Foreclosure Specialist II.

Both occupations are sedentary and involve comparable duties, *i.e.*, "paperwork

and communication involving mortgage and foreclosure processing."  (Doc. 24 at

4.)  Although Plaintiff's description of her responsibilities as a Foreclosure

Specialist II is more detailed than her employer's description, the two job

descriptions include sufficiently similar material duties.  (*Compare* AR 58 ("Works

closely with foreclosure attorneys and trustees and services the foreclosure

during the process. . . . Answers customer questions . . . and corrects records . . . . Examines documents such as deeds, assignments, and mortgages, to ensure compliance with escrow instructions, institution policy, and legal requirements. . . . May call or write loan applicants to obtain information for bank official.") *with* AR 1044 ("Review and approve prepared bidding instructions for upcoming foreclosure sales.  Provide feedback directly to associates and their manager for further review if corrections are needed . . . . Complete quality audits on file transfer reviews completed for post-foreclosure sale forms and update systems . . . . Review and resolve inquiries from attorney firms . . . .").)  This only illustrates why courts properly defer to the DOT, as insurers "cannot be expected to anticipate every assignment an employer might place upon an employee outside the usual requirements of his or her occupation."  *Richards*, 356 F. Supp. 2d at 1287.

The additional duties and demands described by Plaintiff appear to be products of her particular work setting at BOA, not her occupation as generally performed in the national economy.  For example, Plaintiff reported that her responsibilities included assisting "management in researching and/or resolving escalated matters *upon request*," working "on projects *as needed when they were assigned by management*," assisting "Foreclosure Specialists with answering questions, escalating complex issues, and loan research *as needed when management was not available* due to meetings," and other duties upon

45

direction/approval by senior management.  (AR 1044-45 (emphasis added).)  In

her detailed description of her actual day-to-day responsibilities, Plaintiff stated, in

part:

> Between [February and June of 2015,] I was transferred between
> [four] different managers.  Transfer #3 resulted in my being
> responsible for completing additional file transfer manager audits on
> Veteran's Affairs (V.A.) backed loans, and there was only one other
> Foreclosure Specialist II who was authorized to complete the file
> transfer manager audits on V.A. loans in the site. . . . During my
> second month on the V.A. team[,] my teammate and I both had
> about 25 extra file transfer manager audits to complete than the rest
> of our peers due to the increased file transfer volume on these loans.
> To the best of my memory, with both loan types completed[,] I had
> about 90 loans that would need completed file transfer manager
> audits from Super Tuesday volumes, while the rest of my peers only
> completing FHA and conventional type loan manager audits had at
> most between 50-60 loans. . . . It almost goes without saying that
> during the week of Super Tuesday, emails received were not
> reviewed and read until after they had passed the 24 hour timeframe
> requirement expected by management. . . . This added to my stress
> level. . . . Management directed that mandatory compliance trainings
> had to be completed within 10 days of being assigned, however[,]
> some of the managers I worked with wanted the trainings done
> within 3 business days in order to ensure compliance with
> completion timelines.  With all the work on my plate, this was an
> additional stressor as I was having a difficult time completing my
> normal work responsibilities. . . .
> The cancel and bill committee meetings were often hostile.  Other
> lines of business and/or senior managers left myself and my peers
> feeling attacked or ripped apart, and I witnessed one of my peers
> starting to have her own panic attacks in March . . . .
> Management had also made the decision that this team[,] who was
> already the only team responsible for creating and approving bids[,]
> would also be the only team completing file transfer manager audits.
> This meant that the two main job functions of the Foreclosure
> Specialist II's would now be handled by only 4 Foreclosure Specialist
> II's instead of 12. . . . I was observed crying hysterically from a panic
> attack while on the phone during my break by two members of my

new team the day before my first absence in 7/2015 after having just had a meeting at 9:45 . . . . I said to my manager at that point that something had to give and showed her my arm which was visibly shaking, and advised her that this was causing me anxiety.  I continued to be nauseous, shaky, overwhelmed, irritable, and unable to focus for the rest of the day.

. . . There was no overtime permitted.  If you were . . . over 40 hours by one minute, your manager would be asking you why and reminding you that overtime is not permitted and needs to be cleared prior to working it.

(AR 1046-48.)

Based on the above cited excerpts from Plaintiff's description, it is apparent that Plaintiff perceived her job at BOA as stressful, but that does not mean that she could not perform her occupation elsewhere.  *See Landman v. Paul Revere Life Ins. Co.*, 337 F. Supp. 2d 283, 297 (D. Mass. 2004) ("[Plaintiff's] fundamental claim is that her position at Goldstein & Manello had become too stressful for her, be it as a result of her seizure condition, anxiety attacks or otherwise.  However, the record does not support a conclusion that [plaintiff's] inability to handle the stress at one firm meant that she could not perform her occupation as a legal secretary elsewhere.").  Under an "own occupation" disability policy, such as the present one, "[i]t is not one's job with a specific employer, in a particular work environment or in a particular occupational field, that one must be unable to perform."  *Pelletier v. Reliance Standard Life Ins. Co.*, 223 F. Supp. 2d 298, 305 (D. Me. 2002); *see also Stiltz*, 244 F. App'x at 264 (finding that where the "clear plan language allowed MetLife to look beyond the requirements of 'the specific

47

position' Stiltz held," the actual requirements of plaintiff's most recent position are not controlling).  The stress that Plaintiff experienced at her BOA position does not render her disabled from her "own occupation," if she is able to work in her occupation for a different employer and/or in a different work setting.  *See Landman*, 337 F. Supp. 2d at 297; *Pelletier*, 223 F. Supp. 2d at 306; *Becker*, 2006 WL 1360928 at *7 ("So long as the employee can perform the general duties of his occupation in a non-employer specific setting, he need not be able to perform each and every particular assignment."); *Fergus v. Standard Ins. Co.*, 27 F. Supp. 2d 1247, 1254 (D. Or. 1998); *Black*, 2007 WL 2821997 at *9 ("Standard concluded that plaintiff's stress arose from the contract negotiations and conflict with the officers, directors, and employees of MWF.  Thus, even though that stress might preclude plaintiff from continuing to work for MWF, it did not prevent her from performing the Material Duties of her Own Occupation for another employer in Milwaukee or elsewhere.").

Aetna determined that as of December 1, 2016, Plaintiff was indeed able to perform her own occupation, because there was "insufficient evidence of [a] functional impairment in [Plaintiff's] physical or mental capacity."[20]  (AR 776-80.)

---

[20] Defendant argues that given the absence of functional limitations during the relevant period, it was justified in terminating Plaintiff's benefits "irrespective of the applicable occupational description."  (Doc. 24 at 3, 8.)  As shown herein, there is substantial support in the record for Defendant's decision.  Even if there is evidence that would support a contrary conclusion, Defendant's decision must be upheld as long as it had a reasonable basis.  *Murray*, 623 F. Supp. 2d at 1352.

48

For the reasons stated herein, Aetna's decision to terminate Plaintiff's LTD benefits as of that date was neither wrong nor unreasonable.

As stated earlier, Aetna concluded that Plaintiff no longer met the test of disability under the Plan, primarily based on the reports of the peer reviewers, Dr. Pelletier and Dr. Nudell.  (AR 806-07.)  Dr. Pelletier opined "within reasonable medical probability [] that the clinical evidence available does not support [a] functional impairment due to the claimant's psychological conditions from 11/30/2016 and beyond."  (AR 794.)  Dr. Nudell similarly concluded that the medical records did "not support [a] functional impairment from [November 30, 2016] from [an] internal medicine perspective."  (AR 803.)

Plaintiff argues that the reports by Dr. Pelletier and Dr. Nudell are "substantially flawed and unreliable."  (Doc. 25 at 14.)  Plaintiff points out that she has been found disabled from her own occupation by two treating physicians (Dr. Nassar and Dr. Mathews) and a therapist (Ms. Dearborn), and from any occupation by Dr. Libert, who performed an independent medical evaluation, and by the Social Security Administration.

First, to the extent Plaintiff argues that Aetna should have accorded more deference to her treating sources' opinions, and/or that the peer reviewing physicians should have adopted any treating opinion "without establishing any supporting physical or mental restrictions substantiating a functional impairment,

this argument is foreclosed by the Supreme Court precedent." *Pinto*, 2011 WL

536443 at *11.  In 2003, the Supreme Court stated:

> Plan administrators . . . may not arbitrarily refuse to credit a
> claimant's reliable evidence, including the opinions of a treating
> physician.  But, we hold, courts have no warrant to require
> administrators automatically to accord special weight to the opinions
> of a claimant's physician; nor may courts impose on plan
> administrators a discrete burden of explanation when they credit
> reliable evidence that conflicts with a treating physician's evaluation.

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  Therefore, in

the absence of an indication that the peer reviewing physicians arbitrarily refused

to credit the treating sources' opinions, "the Court cannot require Defendant to

afford any special, or increased, deference to the treating physicians than it

already has." *Pinto*, 2011 WL 536443 at *11.

Here, despite Plaintiff's arguments to the contrary, there is no indication

that the peer reviewing physicians arbitrarily refused to credit the treating

sources' opinions.  To the contrary, both Dr. Pelletier and Dr. Nudell reviewed

extensive medical records and opinions from Plaintiff's treating sources (Dr.

Aguilar, Ms. Dearborn, Dr. Shannon, Dr. Nassar, Dr. Mathews, Dr. Crawford, and

Dr. Rak, among others), from her examining physician (Dr. Libert), and from the

SSA, before reaching their conclusions.[21]  (AR 789-91, 799-800.)  To the extent

the peer reviewing physicians did not adopt certain opinions, they provided

---

[21] Plaintiff incorrectly states that Dr. Libert's report was not listed among the
documents reviewed by Dr. Nudell.  (*See* AR 799-800.)

explicit reasons, supported by substantial evidence in the record, for reaching their conclusions.

Dr. Nudell, a Board certified internal medicine physician, noted that Plaintiff's moderate OSA was well controlled on CPAP, with overall good sleep efficacy.  (AR 803.)  He stated, in relevant part: "Although[] the claimant continued [sic] subjective complaints of fatigue, there were overall no clinical findings that supported [a] functional impairment as a result of her reported sleep disorder.  Objective evidence showed overall well controlled apnea."  (*Id.*)

Substantial evidence supports Dr. Nudell's opinions regarding Plaintiff's sleep disorder.  For example, although Dr. Nassar diagnosed moderate OSA and opined that Plaintiff's severe daytime sleepiness had become debilitating in combination with her depression and anxiety, he noted that BiPAP was utilized "with great efficacy" and total sleep time was "more than adequate".  (AR 886-87, 890, 1054, 1168.)[22]  Of note, Dr. Nudell attempted to reach Dr. Nassar for a peer-to-peer consultation regarding Plaintiff's OSA and hypersomnia, and when he

_____

[22] Further, the peer reviewing physician, Dr. Jiva, did not agree with Dr. Nassar's diagnosis of idiopathic hypersomnia, because it is a diagnosis of exclusion.  (AR 1028.) Dr. Jiva listed other possible contributing causes of Plaintiff's excessive daytime sleepiness, such as obesity, weight gain, physical deconditioned status, lack of exercise, medications, and OSA, which were also noted in Dr. Nassar's records.  (AR 887 (also noting that Plaintiff had discontinued Nuvigil because she was attempting pregnancy and was on multiple fertility medications), 1028.)  Dr. Jiva also observed that Dr. Nassar did not document any objective medical evidence of sleepiness, such as MSLT and/or MWT, and did not clarify how Plaintiff's sleepiness caused functional difficulty.  (AR 1028.)

was unable to confer with Dr. Nassar, he sent his report, giving Dr. Nassar an opportunity to voice any disagreement and/or submit additional evidence, which Dr. Nassar failed to do.[23]  (AR 803.)

With respect to Plaintiff's fibromyalgia, Dr. Nudell opined that despite Plaintiff's subjective complaints of pain, "there was overall no basis for [a] functional impairment as a result of this condition," because other than documented trigger points, "[t]here were no other weaknesses or neurologic symptoms, or any other orthopedic restrictions that would support the need for [a] functional impairment."  (AR 804.)  Dr. Nudell's opinions are supported by the record.  (*See, e.g.*, AR 820-21 (noting multiple trigger points), 858 (noting that Plaintiff's fibromyalgia was stable), 894 (noting tenderness on palpation), 899 (noting tenderness on palpation); *but see* AR 821 (opining that Plaintiff was disabled from any occupation, including her own, due to OSA, idiopathic hypersomnia, fibromyalgia, and migraine headaches).)  Plaintiff claims that her rheumatologist, Dr. Mathews, found her disabled, but he only stated that he

---

[23] Despite Dr. Nudell's multiple attempts to reach Dr. Nassar, Plaintiff seems to fault him for "never [speaking] to any of the physicians disabling her."  (Doc. 25 at 14.)  However, Dr. Nudell actually spoke to Dr. Nassar, albeit briefly and only to find out that Dr. Nassar would not speak to him regarding Plaintiff's case without a release of information.  (AR 803.)  Even when a release of information was provided, Dr. Nassar never returned Dr. Nudell's call.  (*Id.*)

would support her "disability case as much as her clinical condition [would] allow." (AR 849.)[24]  Dr. Mathews did not elaborate further.

In addition, with regard to Plaintiff's congenital adrenal hyperplasia, Dr. Nudell stated "there was no indication in the endocrinology records that this chronic condition would support the need for [a] functional impairment."  (AR 804.)  This statement is also supported by the record.  (*See* AR 905 (assessing congenital adrenal hyperplasia, among other conditions).)

Finally, Dr. Nudell noted that he was able to confer with Plaintiff's primary care physician, Dr. Rak, for a peer-to-peer consultation.  (AR 803.)  Dr. Rak advised that "there were no medical conditions restricting the claimant from performing functional tasks/activities, and that any/all restrictions would have been based on the claimant's psychiatric condition(s)."  (*Id.*)

A peer review from a behavioral medicine perspective was performed by Dr. Pelletier, who attempted to reach Dr. Aguilar for a consultation, but was only

---

[24] With respect to Plaintiff's fibromyalgia, Aetna adopted Dr. Nudell's opinion that "there was overall no basis for [a] functional impairment [as] a result of this condition," because besides subjective pain complaints and documented trigger points, "there were no other weaknesses or neurologic symptoms or any other orthopedic restrictions or limitations."  (AR 807.)  Aetna also stated: "Additionally, reasonable treatment for fibromyalgia includes regular exercises and activity[,] therefore[,] [Plaintiff's] sedentary occupation would not interfere with regular and appropriate care [for] her condition." (*Id.*)  Plaintiff argues that "[a]ccepting Aetna's uniquely insurer-friendly position apparently means that it is impossible for employees with sedentary occupations to be disabled by fibromyalgia, no matter how severe their pain, because exercise is good for them."  (Doc. 17 at 19-20.)  It appears that Plaintiff is taking Aetna's statement out of context.  As shown above, Aetna did not ignore Plaintiff's pain complaints, but rather provided specific reasons, supported by substantial evidence in the record, to find no functional impairment as a result of Plaintiff's fibromyalgia.

able to reach Plaintiff's therapist, Ms. Dearborn.  (AR 792-93.)  Although Dr. Pelletier's report was sent to Dr. Aguilar for comments and/or submission of additional evidence, Dr. Aguilar did not respond.  (AR 787, 796, 807.)  Based on the available evidence and his conversation with Ms. Dearborn, Dr. Pelletier concluded that the clinical evidence did not support a functional impairment from a psychological perspective.  (AR 794.)

Plaintiff argues that Dr. Pelletier failed to address the evidence of panic attacks in Ms. Dearborn's records from August 9, 2016, August 31, 2016, September 7, 2016, and October 19, 2016.  (Doc. 17 at 14-15.)  However, Dr. Pelletier addressed in detail Ms. Dearborn's records from October 19, 2016, including Plaintiff's "continued problems with sleep apnea, migraines, [] panic attacks, fibromyalgia, fatigue, and blocked concentration," and continued complaints of "anxiety symptoms, panic attacks, and sleep disturbance."  (AR 791.)  Further, although Dr. Pelletier did not separately address Ms. Dearborn's records from August 9, 2016, August 31, 2016, and September 7, 2016, he specifically noted that he had reviewed Ms. Dearborn's session notes for the period of March 8, 2016 through October 19, 2016, as well as her correspondence from February 10, 2015, January 27, 2016, May 3, 2016, and June 29, 2016.  (AR 789-90.)  Therefore, Plaintiff's claim that Dr. Pelletier somehow ignored the evidence of panic attacks in Ms. Dearborn's records is unfounded.

54

Moreover, Dr. Pelletier was able to reach Ms. Dearborn to discuss her

assessment and treatment of Plaintiff.  (AR 793, 795.)  Dr. Pelletier stated:

> [M]y conversation with Audrey Dearborn, LMHC yielded her opinion
> that the claimant was unable to work because of the combination of
> her mental health and physical problems.  However, there were no
> medical records available from this provider during the timeframe for
> this review and her impressions of the claimant appeared largely
> based on the claimant's report of symptoms and without compelling
> evidence to support [a] functional impairment in the claimant's daily
> functioning and global functioning due primarily to her anxiety and
> depressive disorders.

(AR 795.)

There is substantial evidence in the record to support Dr. Pelletier's

conclusions.  First, the last treatment note by Ms. Dearborn is from October 19,

2016.  (AR 972.)  Although Ms. Dearborn stated that she would reevaluate

Plaintiff in January 2017, there is no record of a reevaluation.  Further, Dr.

Pelletier's opinion that Ms. Dearborn's impressions "appeared largely based on

the claimant's report of symptoms and without compelling evidence to support [a]

functional impairment in the claimant's daily functioning and global functioning,"

also appears to be supported by the overall record.  (*See, e.g.*, AR 778 ("[Ms.

Dearborn] noted that the information she provided is based on what you report

and describe in sessions. . . . Ms. Dearborn added that you report that your daily

activities are impacted by panic attacks, low energy and muscle tension."), 970-

72; *see also* AR 999 (noting in a treatment note dated July 1, 2016 from Dr.

Aguilar that Plaintiff's anxiety and mood were better, she had been sleeping

soundly, and had not had any anxiety attacks in three weeks), 1001 (noting on August 4, 2016 that Plaintiff's anxiety and mood were better, she was sleeping well, she had not had any anxiety attacks in two months, had not taken Klonopin in 2-3 weeks, and had been doing more errands regularly), 997-98 (noting on September 15, 2016 that Plaintiff was presenting well during sessions, her symptomatology did not warrant a referral to a high level of care, such as an IOP or PHP, as she had been improving, and she had been able to go out and do more errands), 967 (noting on October 4, 2016 that Plaintiff had not had any anxiety attacks in 2-3 months, she had not taken Klonopin recently, felt happy 80% of the time, and her mood was better).)  Interestingly, on May 3, 2016, Ms. Dearborn recommended that Plaintiff return to work beginning June 3, 2016, but then, in a letter dated June 29, 2016, she opined that Plaintiff should stay home until at least August 15, 2016.  (AR 1053, 1672.)

Dr. Pelletier also stated that if Plaintiff's psychological conditions resulted in a functional impairment, "it [was] reasonable to expect that she would have been referred to and/or engaged in more appropriately intensive and evidence-based treatment for her anxiety and depressive disorders."  (AR 795.)  Plaintiff points out that she "has undergone regular therapy for the entire period at issue with Ms. Dearborn and regular appointments with her treating psychiatrist Dr. Aguilar," and finds it significant that Dr. Pelletier did not identify any "more appropriately intensive and evidence-based treatment."  (Doc. 17 at 14.)  However, Dr. Pelletier

was not required to identify any such treatment.  Moreover, his statement is supported by the record, which indicates that Plaintiff's treatment has been largely conservative, including medication management, individual therapy sessions, and only one PHP from September 2, 2015 to September 18, 2015. (AR 1383.)

Therefore, to the extent Plaintiff argues that it was improper for Aetna to rely on the opinions of Dr. Nudell and Dr. Pelletier, rather than on the opinions of her treating or examining sources, her argument is rejected.[25]  *See Richey*, 608 F. Supp. 2d at 1312 ("An ERISA administrator is entitled to rely on the opinion of a qualified medical consultant who neither treats nor examines the claimant, but instead reviews the claimant's medical records."); *Murray*, 623 F. Supp. 2d at 1350 (same).

Plaintiff further argues that Aetna did not request her file from the SSA after she was approved for SSDI benefits and did not accord appropriate weight to the determination of disability by the SSA, which Plaintiff considers to be significant, because under the Policy, she was required to apply for SSDI benefits in order to receive unreduced LTD benefits.  (*See* AR 2409-11.)  First, Aetna did not have to

---

[25] Contrary to Plaintiff's argument, Dr. Nudell reviewed Dr. Libert's report prior to rendering his opinions.  (*See* AR 799-800.)  Dr. Libert opined that as a result of her OSA, idiopathic hypersomnia, fibromyalgia, and migraine headaches, Plaintiff was "permanently and totally disabled from performing any occupation."  (AR 820-21.)

request Plaintiff's file from the SSA, because the file was already provided by her counsel on May 26, 2016 and, again, on July 13, 2016.  (*See* AR 1055-95.)

Moreover, Defendant was not required to give any deference to the determination of disability by the SSA.  *See, e.g.*, *Sobh v. Hartford Life & Accident Ins. Co.*, Case No: 8:15-cv-716-T-30EAJ, 2015 WL 7444336, *8 (M.D. Fla. Nov. 5, 2015) (report and recommendation adopted in 2015 WL 7429394 (M.D. Fla. Nov. 23, 2015)) ("The approval of disability benefits by the Social Security Administration is not considered dispositive on the issue of whether a claimant satisfies the requirement for disability under an ERISA-covered plan." (quoting *Whatley v. CNA Ins. Cos.*, 189 F.3d 1310, 1314 n.8 (11th Cir. 1999))), *aff'd*, 658 F. App'x 459 (11th Cir. 2016) (per curiam); *Richards*, 356 F. Supp. 2d at 1288 ("Plaintiff's receipt of Social Security benefits has nothing to do with whether she is entitled to receive benefits pursuant to the Policy[.]"); *see also Black v. Long Term Disability Ins.*, No. 04C1230, 2007 WL 2821997, *11 (E.D. Wis. Sept. 27, 2007) (explaining that a disability award by the SSA is not controlling in an ERISA case); *see also Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1284 (10th Cir. 2002) ("The LINA administrator's reliance on the workers' compensation and social security decisions to deny 'own occupation' benefits was thus arbitrary and capricious given that each such determination relied on irrelevant standards that conflicted with the LINA policy definition of 'own occupation' disability.").  As explained in *Richards*:

> In determining entitlements to Social Security benefits, the adjudicator measures the claimant's condition against a uniform set of federal criteria.  The validity of a claim to benefits under an ERISA plan, on the other hand, is likely to turn, in large part, on the interpretation of terms in the plan at issue. . . . Deference is due that view.

*Richards*, 356 F. Supp. 2d at 1288 (internal quotation marks and citations omitted) (also stating that the SSA applies a "treating physician rule," which does not govern ERISA disability claims).

Also, as Defendant points out, when the SSA determined that Plaintiff was entitled to SSDI benefits, some of the records on which Aetna relied for its decision were not available.  (Doc. 24 at 11.)  These records included: Dr. Aguilar's treatment notes showing improvement in Plaintiff's mental condition in 2016, the peer reviews by Dr. Pelletier and Dr. Nudell, and Dr. Rak's opinion that Plaintiff was not disabled.  (*Id.*)  As such, the Court agrees with Defendant that the SSA award furnishes no basis for reversing Aetna's decision.[26]  *See Sobh*, 2015 WL 7444336 at *8 (finding no error in defendant's decision to terminate plaintiff's benefits, and specifically in its failure to give significant weight to the contrary decision by the SSA, where defendant rendered its decision over two years after the SSA found plaintiff disabled, and where defendant considered new evidence that did not exist at the time of the SSA's decision); *Black*, 2007 WL

---

[26] Further, as in *Sobh*, Defendant's decision letters of December 1, 2016 and July 10, 2017 acknowledged that Defendant's decision was contrary to that by the SSA, but explained that different standards applied and that Defendant's decision relied on evidence that was not available to the SSA.  (AR 779, 807-08.)

2821997 at *11 (noting that "the Social Security analyst relied on different information, opinions and records than the analysts at Standard").

Further, to the extent Plaintiff implies that there was some sort of procedural unfairness based on the Eleventh Circuit's decision in *Melech v. Life Insurance Company of North America*, 739 F.3d 663 (11th Cir. 2014), Plaintiff is mistaken.  In *Melech*, the policy effectively required all claimants to apply for SSDI at the outset; and if a claimant failed to apply, the administrator could reduce her benefits under the policy, if any, by the amount of SSDI that the claimant could have received.  *Id.* at 668.  In that case, the administrator knew that the claimant had applied for SSDI benefits, but it "refused to wait for the SSA evidence, even though it could have relied on that same evidence to protect its SSDI deduction had it decided to pay Melech's claim."  *Id.* at 675.  The Eleventh Circuit concluded that the administrator should have considered the evidence generated by the SSA process before denying benefits and the failure to do so "raise[d] questions of procedural fairness."  *Id.* at 672, 676 n.21.  The court stated, "having sent Melech to the SSA to seek alternative compensation, [the administrator] was not free to ignore the evidence generated by the SSA process as soon as it no longer had a financial stake in the amount of money the SSA decided to award."  *Id.* at 675.  The court added: "Although there is no technical requirement to explicitly distinguish a favorable Social Security determination in every case, [i]f the plan administrator (1) encourages the applicant to apply for

60

Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary and capricious." *Id.* at 676 n.21 (citations omitted).  The Eleventh Circuit concluded that since the administrator's decision to deny benefits "was based on an administrative record that did not contain the information from Melech's SSA file, the proper course of action [was] to remand Melech's claim to [the administrator] rather than to evaluate the merits of Melech's claim for benefits under the Policy using evidence that [the administrator] did not consider."  *Id.* at 676.

The present case is distinguishable from *Melech* for a number of reasons. First, Defendant here was provided with the SSA file even before Plaintiff formally appealed the denial of her LTD benefits.  (AR 1055-95.)  Further, Defendant indicated in both its December 1, 2016 termination letter and its July 10, 2017 letter upholding the termination of benefits, that Defendant had considered the SSA's decision awarding SSDI benefits to Plaintiff.  (AR 779, 807-08.)  In both letters, Defendant specifically explained why it was unable to give significant weight to the SSA's determination.  (*See* AR 807-08 ("We understand that [you] were approved for [SSDI] benefits.  However, our disability determination and the [SSDI] determination are made independently and are not always the same.  The difference between our determination and the [SSDI] determination may be

driven by the [SSA] regulations.  For example, SSA regulations require that certain disease[s]/diagnoses or certain education or age levels be given heavier or even controlling weight in determining whether an individual is entitled to [SSDI] benefits.  Or, it may be driven by the fact that we have information that is different from what [the] SSA considered.  Your Social Security award was dated April 12, 2016 which is more than 12 months ago and is no longer current.  We have new[,] more relevant information that our review has been based upon. Therefore, even though you are receiving [SSDI] benefits, we are unable to give it significant weight in our determination, and we find that you are no longer eligible for LTD benefits based on the [P]lan definition of Totally Disabled quoted above."); *see also* AR 779.)

One of these reasons was that the SSA's decision was based on outdated evidence as it did not include the new evidence available to Defendant.  In *Melech*, the opposite was true: the SSA, not the administrator, possessed new evidence, which the administrator never considered because it did not ask either the claimant or the SSA for the file, despite being informed by the claimant that SSDI benefits had been approved.  *Melech*, 739 F.3d at 669-70.  As such, the procedural unfairness that resulted from the administrator's approach in *Melech* is not present here.

Finally, in determining whether Defendant's decision was arbitrary and capricious, one factor to take into account is whether Defendant was acting under

a conflict of interest.  "A conflict of interest exists where the plan administrator determines eligibility for benefits and also pays those benefits out of its own assets."  *Townsend*, 295 F. App'x at 975.  Conflict of interest, as a factor, will depend on the circumstances of each case.  *Glenn*, 554 U.S. at 108.  It "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration."  *Id.* at 117.  In contrast, "[i]t should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits."  *Id.*

Plaintiff points out that "Aetna underwrites the benefits, created the language of the policy at issue, makes the ultimate decision as to whether benefits are payable, and has a structural conflict of interest with respect to the insurance policy at issue."  (Doc. 25 at 18.)  Defendant does not dispute that it has a structural conflict of interest, because it both decides claims and pays benefits out of its own funds.  (Doc. 15 at 14; *see also* Doc. 25-1 at 3.)

Plaintiff then argues that Aetna's allegedly selective consideration of the evidence and factually incorrect assertions, among other alleged irregularities

that the undersigned has already rejected, justify giving more weight to the conflict factor.  (*See* Doc. 25 at 18-19; Doc. 17 at 24-25.)  As these exact arguments have already been rejected herein, they do not provide a basis for giving more weight to the conflict factor.  Even considering Defendant's conflict, the decision to terminate benefits was not unreasonable, and, therefore, it was not arbitrary and capricious.  "There is nothing in the totality of the circumstances that indicates that Defendant's conflict of interest was a major factor in its decision." *Pinto*, 2011 WL 536443 at *13.  Defendant investigated the case thoroughly and developed a complete record.  Also, Plaintiff has not produced any evidence that Defendant's decision was affected by the fact that it insured the Policy.  Therefore, even if Defendant's decision to terminate benefits was *de novo* wrong, it must nevertheless be affirmed.

In sum, under either a *de novo* or arbitrary and capricious standard, Plaintiff has not satisfied her burden to show that she is entitled to continuing LTD benefits after December 1, 2016.  Defendant considered the entire record in this case and apparently gave more weight to some opinions than to others.  Even assuming that Defendant's decision was somehow wrong, it was certainly not arbitrary or capricious.

Accordingly, it is respectfully **RECOMMENDED** that:

1.      Defendant's Motion (**Doc. 15**) be **GRANTED.**

2.      Plaintiff's Motion (**Doc. 17**) be **DENIED**.

3.     The Clerk of Court be directed to enter judgment accordingly,

terminate any pending motions, and close the file.

**DONE AND ENTERED** in Jacksonville, Florida, on November 14, 2018.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

The Honorable Timothy J. Corrigan
United States District Judge

Counsel of Record